Charles Wesley JAMES,
Plaintiff-Appellee,

v.

'RIVER PARISHES COMPANY, INC.,
Defendant-Appellee,

v.

C & R TOWING AND FLEETING, INC.,
Defendant-Appellant.

No. 81–3223.

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1982.

**1130**

Maurice C. Hebert, Jr., New Orleans, La., for C & C Towing.

Homer Ed Barousse, Crowley, La., for James.

Michael L. McAlpine, New Orleans, La., for River Parishes Co.

Before RUBIN, TATE and GARWOOD, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The bountiful maritime traffic carried on the Mississippi River produces collisions and personal injuries in infinite variety. In this personal injury suit, it is contended that a drifting barge struck a moored vessel, causing a member of the vessel's crew to be flipped over the vessel's bulwark. This requires us both to review our jurisprudence concerning the burden of proof of fault for injuries sustained when a drifting barge strikes a vessel and to assess the evidentiary support for the trial judge's conclusion that the plaintiff's injury was caused by the drifting barge. We conclude that the owner of a barge adrift on the river bears the burden of proof that it is nomadic without fault on his part and that the judgment for the plaintiff should be affirmed.

### I.

Charles Wesley James was employed by River Parishes Company, Inc. as a deckhand aboard the M/V RIVCO ST. JAMES. River Parishes owns and operates a barge landing facility located on the Mississippi River. This facility consists of two barges, made up abreast and positioned parallel to the riverbank. The M/V RIVCO ST. JAMES and two other vessels were moored in the vicinity of this facility.

C & R operates a fleeting facility upriver of the River Parishes location. This consisted at the time of four tiers or rows of loaded barges and two of empties. Each tier of barges was fastened to the west bank by a one and one-quarter inch shoreline, which was attached by a shackle to a one-inch extension line. The extension line was attached to the barge nearest the shore and each barge in the tier was in turn attached to the next. In addition, a one and one-half inch line ran from the stern of that barge to the west bank. The captain on duty testified that he had checked the shorelines and had observed no problems. An ocean-going vessel passed through the area at a rapid speed unusually close to the C & R fleeting facility. Shortly thereafter the five barges at Tier 6 broke away in a single cluster, still made up together.

James was standing radio watch on the M/V RIVCO ST. JAMES, facing the landing barges. He testified that he was thrown from the deck onto one of the landing barges by a single impact from the drifting barges. Cross-examination revealed, though, that he was unsure whether the drifting barge slammed his vessel into

the landing barge or whether the only impact was of his vessel against the landing barge. He admitted under cross-examination that he may not have moored his vessel snug against the landing barges because it was "hard to tie her up at times." However, taking the record as a whole, it is fair to conclude that the impact of the drifting barges caused him to fall. The captain and the two other deckhands of the M/V RIVCO ST. JAMES testified that the three River Parishes vessels were secured snugly to each other and to the landing barge, with no gap.

While James sued both his employer under the Jones Act[1] and C & R as a tortfeasor, the trial judge found C & R solely liable. His factual findings were that several barges owned by C & R broke away from their moorings and struck either the M/V RIVCO ST. JAMES or the dock or vessel to which it was moored and that this in turn caused James' injury. He found that the M/V RIVCO ST. JAMES was not unseaworthy and its owner not negligent. Without making express findings on contributory negligence, he assessed damages without reduction, and awarded James $200,000 for pain, suffering, and disability, plus $75,000 for loss of earnings.

Counsel for C & R contends that James' injury must have occurred because his vessel was improperly moored, leaving a gap between it and the landing barge. He makes much of the fact that James fell forward, and urges that this proves that the impact between the M/V RIVCO ST. JAMES and the landing barge caused James to fall. If he had fallen as a result of an impact by a barge on the other side of his vessel, the argument runs, he would have fallen backward.

This seems, however, to place too much emphasis on the dynamics of an event about which we can know little. No expert testified about how people fall on impact, how their stance or posture may affect their fall, or about the differences, if any, between a blow from the rear and an angled blow. The issue still remains: what caused the impact? Presumably the difficulty of resolving this question, as well as the trial judge's belief that exactly where and when the impact occurred was immaterial, caused him to conclude that "the breakaway barge caused the incident that caused the accident to the plaintiff." He decided that "it is more likely than not that there was some impact between the breakaway barges and *either the C & R barge or the other upriver tug*, which was transmitted to the ST. JAMES, which caused the accident." (Emphasis added.)

The trial court's findings are not sifted through a fine mesh. We may reverse only if clear error contaminates them. Fed.R. Civ.P. 52(a); *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *River Terminals Corp. v. Southwestern Sugar & M. Co.*, 274 F.2d 36, 37 (5th Cir. 1960). This factual conclusion was not clearly erroneous.

■ Nor is C & R's attack on the credibility of the witness who corroborated James of any avail, for assessment of credibility is for the trier of fact. Though there was only circumstantial proof that the impact of the C & R barges caused the injury, it was enough to warrant the conclusion reached by the trial judge. There was evidence that C & R's barges, moored a short way upriver from the River Parishes facility, did break away, and no indication that other barges were drifting in the river at the same time.

## II.

We turn to the question of liability for the incident. The plaintiff presented no evidence of the cause of the breakaway. The trial judge relied on a presumption of negligence: if a barge breaks away and then causes damage or injury, negligence by its custodian is presumed and the burden of disproof is on the custodian.

■ It is well established that "a vessel which drifts into collision is presumed to be at fault until the contrary is made to appear[.]" *Compania de Navigacion v. S/S*

---

1. 46 U.S.C. § 688.

*American Oriole*, 474 F.Supp. 22, 27 (E.D. La.1976), *aff'd on basis of district court opinion*, 585 F.2d 1326 (5th Cir. 1978). *Accord, The Louisiana*, 3 Wall. (70 U.S.) 164, 18 L.Ed. 85 (1865); *Pasco Marketing, Inc. v. Taylor Towing Serv., Inc.*, 554 F.2d 808, 810 (8th Cir. 1977); *Petition of United States*, 425 F.2d 991, 993 (5th Cir. 1970); *Zubik v. Zubik*, 384 F.2d 267, 270 (3d Cir. 1967). This presumption "suffices to make a prima facie case of negligence against the moving vessel." *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967). *Accord, Compania de Navigacion*, 474 F.Supp. at 27; *Wisconsin Barge Line, Inc. v. Barge Chem 301*, 390 F.Supp. 1388, 1394 (M.D.La.1975).

■ These cases do not say whether the risk of nonpersuasion on the issue of negligence, or merely the burden of producing rebuttal evidence, rests on the drifting vessel. We read the precedent as consistent, however, with the rule that the burden of persuasion is on the party whose vessel is adrift. Thus, in *The Louisiana*, the Supreme Court considered the very fact of drifting to create a conclusive presumption of improper mooring:

> The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she *can show affirmatively* that the drifting was the result of

inevitable accident, or a *vis major*, which human skill and precaution and a proper display of nautical skill could not have prevented.

. . . .

. . . And the fact that under these circumstances she did drift, is *conclusive evidence* that she was not sufficiently and properly secured.

3 Wall. (70 U.S.) at 174, 18 L.Ed. at 88 (emphasis added).[2]

While we have not deemed drifting to be conclusive evidence of negligence, we have noted, in a case involving a drifting vessel, that "where a collision occurs between a moving vessel and a moored vessel, a presumption of fault is raised against the offending vessel, which presumption must be rebutted by a preponderance of the evidence." *Petition of United States*, 425 F.2d at 995. If the drifting or moving vessel offers as a defense that the collision was an unavoidable accident or *vis major*, "[t]he burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense." The vessel must show that the accident could not have been prevented by "human skill and precaution and a proper display of nautical skills[.]" *Id.*[3]

■ Accordingly we now make explicit what we believe to be the correct rubric: When a drifting vessel causes damage, an

**2.** Moreover, the rule is well settled that when a vessel under its own power collides with an anchored vessel or a navigational structure, the burden of proving absence of fault or inevitable accident rests on the piloted vessel. *The Oregon*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); *The Virginia Ehrman*, 7 Otto (97 U.S.) 309, 315, 24 L.Ed. 890 (1877); *The Clarita*, 23 Wall. (90 U.S.) 1, 13, 23 L.Ed. 146, 150 (1874); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794–95 (5th Cir. 1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978); *Carr v. Hermosa Amusement Corp., Ltd.*, 137 F.2d 983 (9th Cir. 1943), *cert. denied*, 321 U.S. 764, 64 S.Ct. 520, 88 L.Ed. 1060 (1944). This same allocation of burdens is appropriate when a drifting vessel collides with an anchored vessel because the circumstances suggest equally strongly that the drifting vessel is at fault. In any case, the drifting vessel can more easily produce evidence to absolve itself of responsibility.

**3.** The Eighth Circuit has likewise implied that the drifting vessel has the burden of persuasion on the issue of negligence.

> The district court found that when a collision is caused by a vessel drifting from her moorings, the moving vessel is presumed to be at fault until the presumption is offset by affirmative proof that absolves her. *See The Louisiana*, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1865). *Under the presumption all parties agree that Security had the burden of proving exoneration from liability.*

*Pasco Marketing, Inc. v. Taylor Towing Serv., Inc.*, 554 F.2d 808, 810 (8th Cir. 1977) (emphasis added). C & R seeks to distinguish *Pasco* on the ground that it involved a towed barge, but as the quotation shows, the barge had been tied up and had drifted.

inference arises as a matter of law that the vessel was adrift through negligence. Such an inference is called a presumption. The custodian of the drifting vessel bears the burden of disproving fault by a preponderance of the evidence. In other words, he bears the risk of non-persuasion. This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored. *See* 9 J. Wigmore, Evidence § 2487 (Chadbourn rev. 1981). It is not governed by Rule 301 of the Federal Rules of Evidence. The weight and effect of such a presumption is determined, as a matter of substantive law, in the light of the considerations that prompted its adoption. Judge Weinstein and Professor Berger have commented in their treatise on the Federal Rules of Evidence: "That the federal courts may need to create and modify presumptions in enforcing federal substantive law seems clear." 1 J. Weinstein, Evidence ¶ 301[02] (1981).

Here, of course, we neither create nor modify a presumption but merely apply a rule that long antedated adoption of the Federal Rules of Evidence. In doing so, we act in conformity to the traditional responsibility of the federal courts to enunciate and develop the substantive principles of admiralty and maritime law. *See Foremost Ins. Co. v. Richardson,* —— U.S. ——, —— n.9, 102 S.Ct. 2654, 2664 n.9, 73 L.Ed.2d 300, 312 n.9 (1982) (Powell, J., dissenting); *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 360–61, 79 S.Ct. 468, 474, 3 L.Ed.2d 368, 376 (1959); D. Robertson, Admiralty and Federalism 136, 137 n.7 (1970). The allocation of burdens we apply today has been fashioned by the federal courts under the authority of Article III of the Constitution. In addition to the factors we have discussed that make this allocation of burdens logical, we would be reluctant to hold that adoption of the Rules of Evidence altered such a substantive principle.

■ The district judge correctly applied this rule in substance. He concluded that the testimony of the C & R captain was not enough to prove that the mooring lines had been properly maintained. Nor was the passage of a seagoing vessel unusually close to the riverbank a sufficiently·extraordinary event to exonerate C & R. These conclusions bear the stamp of good judgment, and we affirm them.

■ There was evidence to support the trial judge's conclusion that neither River Parishes nor the plaintiff was negligent. Even if there was a gap between the tug and the landing barge, creating a danger that a crewman would fall overboard, this would not have heightened the likelihood that a person would be injured in a collision with a drifting vessel. James might have been injured in either case.

### III.

■ C & R also attacks the quantum of damages. Before the injury, James had never earned more than $3,600 a year. In the six previous years he had not worked regularly. At the time, however, he was regularly employed at the rate of $44 per day, working seven days on and seven off. While he has an eighth-grade education and is capable of learning to do other work, he is permanently disabled from working as a deckhand. The award of $75,000 for loss of earnings was, therefore, not beyond the discretion allowed the judicial factfinder. James' initial injuries were painful. He underwent subsequent treatment, physical therapy and testing, including painful nerve root conduction studies, and a surgical procedure. He walked on crutches for seven months prior to his surgery, for approximately two months after the surgery and will wear a leg and foot brace for the rest of his life. We cannot say that the allowance of $200,000 for pain, suffering, and disability was outside the factfinder's pale.

For these reasons, the judgment is AFFIRMED.

GARWOOD, Circuit Judge, dissenting.

I respectfully dissent. The trial court, like the majority, decided this case under what I consider the erroneous view that C & R had the burden of persuasion on the

issue of whether the adrift condition of the barges was due to its negligence. This is contrary to the provision of Rule 301 of the Federal Rules of Evidence, that presumptions do not effect a shifting of the burden of persuasion.

The fact that C & R's barges were adrift gave rise to a presumption that this was due to C & R's negligence. Under Rule 301, the effect of the presumption was to cast on C & R the burden of producing evidence that such condition did not result from its own negligence. I believe C & R met this burden by evidence that the barges were properly moored. However, this evidence was not conclusive. Nor does the production of such evidence operate to "burst the bubble" of a presumption. Accordingly, despite C & R's evidence, there remained for consideration by the trier of fact what the majority accurately describes as "the logical deduction that a vessel found floating loose was improperly moored." In this posture of the case, the trial court, as fact finder, was free to find, in accordance with the presumption and on the basis of the referenced "logical deduction," that C & R was negligent. But the trial court was not *required* to so find. And, such a finding should not have been made unless the trial court was affirmatively persuaded on consideration of the evidence as a whole, including both the "logical deduction" and C & R's testimony, that C & R was in fact negligent. Since it is evident from the trial court's memorandum opinion that it cast the ultimate burden of persuasion on C & R, and ruled against it because it had failed to convince the trial court it was free from negligence, I believe the case should be remanded for findings on this issue under the correct standard.

The language of Rule 301 reflects that it is to apply in all civil actions, except where otherwise specified by the Rules or an Act of Congress. Certainly this includes admiralty cases. *See* Rule 1101(b). It is true that for some purposes the burden of persuasion may be regarded as a substantive, rather than a procedural, matter. The significance of this is, I believe, implicitly recognized in Rule 302, which provides that

state law will control the effect of presumptions concerning claims or defenses established by state law. Accordingly, the drafters of the Federal Rules of Evidence appear to have contemplated that Rule 301 would govern in numerous other instances where the application of the burden of persuasion might properly be characterized as "substantive." There is nothing in the language of Rule 301, or elsewhere in the Federal Rules of Evidence, to indicate that Rule 301 was intended to apply only to those specific presumptions expressly recognized or provided for in the Federal Rules of Evidence. Rather, the intent seems to have been to create a uniform rule for civil cases respecting the effect, on the burden of producing evidence and the burden of persuasion, of all nonconclusive presumptions, except as otherwise might be provided in the Rules of Evidence themselves or in an Act of Congress. I do not reach the question of whether it was the intention of Congress to prevent the courts in civil cases from *ever* applying different judge-made rules regarding the shifting of the burden of persuasion, or the extent of Congress' constitutional power in that regard. Simply as a matter of policy, and in the interests of uniformity, it seems to me to be preferable to follow the provisions of Rule 301, absent some most compelling reason to the contrary. Finding none such here, I believe Rule 301 should have been applied in the instant case. The decisions of the Supreme Court and of this Court relied on by the majority which speak to the issue of the burden of persuasion were decided before adoption of the Federal Rules of Evidence, and hence are not controlling on this question.